******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

PALMER, J., with whom McDONALD, J., joins, concurring in part and dissenting in part. I agree with and join parts I and II A of the majority opinion. For the reasons enumerated by Justice D'Auria in his concurring and dissenting opinion, I disagree with part II B of the majority opinion and conclude that the trial court's erroneous exclusion of the video recording of Patrick J. Allain's polygraph pretest interview was not harmless error. I also disagree with part III of the majority opinion because I believe that the defendant, George Michael Leniart, was entitled to introduce the expert testimony of Alexandra Natapoff, a law professor, regarding the questionable credibility of incarcerated informants and the risk of relying on them as witnesses in criminal prosecutions.

I reach the conclusion regarding the proffered testimony of Natapoff—whose expertise on the use of jailhouse informants has not been challenged by the state—for essentially the same reasons that are set forth in the opinion of the Appellate Court. See *State* v. *Leniart*, 166 Conn. App. 142, 212–28, 140 A.3d 1026 (2016). In particular, I agree with the Appellate Court that, contrary to the determination of the trial court, Natapoff's testimony would not have invaded the exclusive province of the jury to assess the credibility of witnesses; id., 221–24; and the subject matter of her testimony was not within the ken of the average juror. Id., 224–27. I also agree with the Appellate Court that the trial court's general instruction cautioning the jury about the reliability of jailhouse informant testimony, given in accordance with this court's mandate in *State* v. *Arroyo*, 292 Conn. 558, 569–71, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010), was an inadequate substitute for Natapoff's testimony. See *State* v. *Leniart*, supra, 227.

With respect to the issue of whether Natapoff's testimony would have constituted an improper usurpation of the jury's role as the sole judge of witness credibility, the Appellate Court aptly explained that, "[a]s long as [an] expert does not directly opine about a particular witness' credibility or . . . testify in such a way as to vouch indirectly for or bolster the credibility of a witness, the expert's testimony would not invade the province of the jury to decide credibility and may be admitted." Id., 223. As the Appellate Court further explained, there was nothing in Natapoff's testimony that "cross[ed] the line into impermissible expert testimony regarding credibility. Natapoff, in fact, offered no testimony regarding any of the particular informants in this case, either with respect to their status as informants, how they had obtained their information, or their potential reliability as witnesses. The defense clearly indi-

cated to the court during argument that the defendant did not intend to ask Natapoff about the present case and that Natapoff had no specific knowledge of the case or the informants involved. [Rather] Natapoff's testimony, as proffered, was narrowly tailored to provide only general information related to informant testimony and its unreliability . . . and could have aided the jury in making its own informed and independent assessment regarding the credibility of informants in the present case." (Citation omitted.) Id., 223–24. Consequently, there was no reason to believe that Natapoff's testimony would have intruded into the jury's exclusive domain of determining the credibility of the state's jailhouse informant witnesses.

With regard to whether the information about jailhouse informants that the defendant sought to present through Natapoff's testimony was known to the average juror, the Appellate Court first observed that Natapoff testified outside the presence of the jury about "the inherent problems associated with the use of jailhouse informants. According to Natapoff, the manner in which informants are used in the criminal justice system is largely unregulated and secretive, and the public has very little knowledge about the process. She testified that jailhouse informants are known to fabricate information because they are aware that they can barter with the state for favorable treatment on the basis of such information.

"In particular, Natapoff stated: 'We have evidence of collusion between jailhouse informants in which informants cooperate in order to create stories that they corroborate in order to persuade the government to use that information. We know that sometimes informants and criminal offenders can be very entrepreneurial about coming up with information, knowing that the system will likely reward them in some way.' The hope for favorable treatment also provides a strong incentive for informants to search out any source of information, reliable or not, so that they can trade that information to the authorities.

"Natapoff also testified about studies that demonstrate that the usual cautionary instructions given to jurors about informant testimony generally are not effective and that even if jurors are made aware of and cautioned about an informant's compensation or other motivation to fabricate testimony, jurors are ill-equipped to accurately evaluate an informant's credibility and often will accept the testimony as true. One study published by Northwestern Law School, discussed by Natapoff during her testimony, indicated that approximately 45 percent of all the wrongful capital convictions identified in this country were the direct result of an informant who was lying. According to Natapoff, informants' stories are often difficult to corroborate or to contradict, especially in cases in which

the informant's testimony is the central evidence against the defendant." Id., 215–16.

In addition, when the prosecutor questioned Natapoff on cross-examination why an average juror likely would not have sufficient knowledge about the inherent unreliability of jailhouse informants based on common sense alone, Natapoff stated: "I think that a lay person on a jury cannot know the extent of the benefits and expectations that an informant in our system would reasonably expect to get; that a promise or an understanding made by a police officer or prosecutor to an informant . . . and the history of the use of informants in our jails and prisons give informants and law enforcement knowledge about benefits that a lay person couldn't understand and wouldn't see from the outside. . . . I think a lay person would not expect or could not be expected to understand how much effort informants sometimes put into coming up with information from stealing files from other inmates to calling outside sources and asking for resources from the newspapers and media from outside sources. They couldn't be expected to understand the culture in jails; the understanding that this entrepreneurial approach to information is expected. A lay person on a jury could not be expected to know how infrequent perjury prosecutions are for informants who turn out to be lying. In polling jurors after trials or after cases [in which] a wrongful conviction is found, you sometimes hear jurors say that they think that if an informant lies, [he or she will] be prosecuted for perjury but because that is so rare, that expectation is misguided, although it's a widely shared expectation, I think, among the public." (Internal quotation marks omitted.) Id., 216–17.

In light of Natapoff's unchallenged testimony and the state's failure to present any contrary evidence or information, by way of empirical studies or otherwise, demonstrating that average jurors are sufficiently knowledgeable about the use and unreliability of jailhouse informants so as to render expert testimony on the subject unnecessary, the Appellate Court concluded that the trial court had abused its discretion in precluding Natapoff from testifying. Id., 220–21. I agree with this conclusion and with the Appellate Court's reasons for reaching it. As that court explained, although average jurors may have some limited knowledge about the use of jailhouse informants, we cannot presume that they are aware either of the prison culture in which such testimony is spawned or the full extent to which such informants are likely to benefit as a result of their testimony. Id., 224. Jurors also are unlikely to be aware of the efforts undertaken by jailhouse informants to obtain their information and of the various sources of that information. Id. Furthermore, jurors often believe that a jailhouse informant who lies will face perjury charges when, in fact, such charges are almost never brought. Id., 225. Thus, even with an instruction cau-

tioning jurors to take great care in evaluating the credibility of jailhouse informants, jurors are ill-equipped to do so because they simply are unaware of the true dangers in relying on such testimony.[1] Id. Finally, jailhouse informants played a significant role in the state's case against the defendant; id., 221; a fact that underscores the importance of Natapoff's testimony.

It bears emphasis that both this court and the legislature have recognized the unique problems attendant to the state's use of jailhouse informant testimony. One decade ago, in *State* v. *Arroyo*, supra, 292 Conn. 558, we expressly recognized the need to educate jurors on the inherent unreliability of jailhouse informant testimony. In coming to that conclusion, we explained that, "[i]n recent years, there have been a number of high profile cases involving wrongful convictions based on the false testimony of jailhouse informants. . . . Several of these cases resulted in formal investigations that shed much needed light on the extensive use of jailhouse informants in criminal prosecutions, an issue that previously had been largely a closeted aspect of the criminal justice system. . . . One such investigation . . . revealed an appalling number of instances of perjury or other falsifications to law enforcement . . . . The [investigation] also [revealed] that a particularly clever informant realizes that a successful performance on the witness stand is enhanced if it appears he or she is not benefiting from the testimony. . . . These informants wait until after [they have] testified to request favors—a request that is generally answered. . . . And, because the reward is not offered before the testimony, the jury has no way to measure the informant's motivation to fabricate testimony, as the prosecutor . . . is under no obligation to disclose nonexisting exculpatory evidence. . . . Thus, the expectation of a [r]eward for testifying is a systemic reality . . . even [when] the informant has not received an explicit promise of a reward. In addition, several commentators have pointed out that jailhouse informants frequently have motives to testify falsely that may have nothing to do with the expectation of receiving benefits from the government."[2] (Citations omitted; footnotes omitted; internal quotation marks omitted.) Id., 567–69. Thus, inmates have various incentives to fabricate confessions by other inmates or otherwise to testify falsely, incentives with which jurors are not likely to be familiar.

Insofar as the informal and largely undisclosed nature of the relationship between a typical jailhouse informant and the state is concerned, this court, in *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 198 A.3d 562 (2019), recently explored the subject of cooperating witnesses generally, and what we found was troubling, to say the least.[3] In particular, we addressed and expressed concern over what we characterized as the "state's practice of informal, off-the-record leniency understandings with cooperating witnesses." Id., 603.

We explained this practice and the serious hazards associated with it: "These [informal, off-the-record leniency] understandings . . . often involve a prosecutor's suggesting—although not promising—that a favorable recommendation to the sentencing judge and/or a reduction in the charges against the witness might be forthcoming in exchange for the witness' testimony inculpating another defendant. . . . Often such representations are made only to the witness' counsel, while the prosecutor's communication with the witness makes clear that there is no promise. Under such circumstances, the prosecutor may not actually know if any representations of possible leniency have been conveyed by the witness' counsel to the witness. Thereafter, if, before the jury, the witness denies that there is any actual 'agreement' or 'deal,' the prosecutor can accurately state . . . that he does not have a reason to know if the witness is being untruthful. Although it might very well be accurate that no definitive promises have been made by the state, and, even if any possible outcomes as described to counsel might be 'tentative,' experienced counsel operating in a courthouse in which he or she is familiar with the practices of prosecutors and presiding judges can comfortably advise the witness of the possible credit that might follow from his testimony. Thus, these 'hypothetical' outcomes serve as a real incentive to motivate a witness to testify for the state.

"Left out of this equation, however, is the jury. . . . These vague understandings can prevent defense counsel from effectively impeaching the witness for bias, perhaps leaving jurors with the impression . . . that [the witness did not have] any incentive to testify favorably for the state. . . . Jurors are not well versed in the nuanced vagaries of such leniency agreements. Yet, we rely on jurors to assess a witness' credibility—including a witness' motivation to testify—while withholding from them critical information that would help them assess just how motivated that witness might be. This practice, therefore, carries with it risks that threaten the efficient and fair administration of justice."[4] (Citations omitted.) Id., 603–605.

Although we indicated in *Marquez* that the state can avoid the obvious problems attendant to this practice by, inter alia, memorializing more clearly the nature of any agreement or understanding it has with the cooperating witness, we candidly acknowledged that "the absence of an express agreement may require a defendant to explore other means to reveal to the jury a cooperating witness' motivation to testify." Id., 606. We then stated: "For example, in an attempt to inform the jury about a system in which promises are not explicitly made but understandings are drawn from pretrial discussions, defendants might resort to calling expert witnesses to attempt to explain to the jury just how much leniency a cooperating witness can expect from his testimony." Id. That is precisely the kind of testimony

that Natapoff was qualified to offer in the present case.

The problems inherent in the state's use of jailhouse informant testimony have become so acute that the legislature has seen fit to weigh in on the issue during its most recent legislative session. See Public Acts 2019, No. 19-131 (P.A. 19-131). That legislation, among other things, requires that prosecutors who intend to introduce the testimony of a jailhouse witness disclose certain information to defense counsel, including the complete criminal history of the jailhouse witness, any pending charges, any cooperation agreement between the state and the witness, any benefits offered or provided by the state to the witness, the substance, time and place of any statement allegedly given by the defendant to the witness, the substance, time and place of any statement given by the witness implicating the defendant in the charged offense, whether, at any time, the witness recanted any testimony subject to disclosure, and information concerning any other criminal prosecution in which the jailhouse witness previously testified or offered to testify. See P.A. 19-131, § 1. In addition, the legislation establishes a statewide system for recording and tracking information on the use of jailhouse witnesses. See P.A. 19-131, § 3.

Finally, and perhaps most significantly, under P.A. 19-131, in cases involving murder, murder with special circumstances, felony murder, arson murder, sexual assault in the first degree, aggravated sexual assault in the first degree, and aggravated sexual assault of a minor, and, upon motion of the defendant, the trial court must conduct a hearing to decide whether a jailhouse witness' testimony is sufficiently reliable to be admissible. See P.A. 19-131, § 2. The legislation further provides that, unless the prosecutor can establish by a preponderance of the evidence that the witness' testimony is reliable, the court shall not allow the testimony to be admitted. See P.A. 19-131, § 2. Finally, in making its determination concerning the reliability of the witness' testimony, the court is required to consider the factors enumerated in P.A. 19-131, § 1, as well as the following factors: "(1) [t]he extent to which the jailhouse [witness'] testimony is confirmed by other evidence; (2) [t]he specificity of the testimony; (3) [t]he extent to which the testimony contains details known only by the perpetrator of the alleged offense; (4) [t]he extent to which the details of the testimony could be obtained from a source other than the defendant; and (5) [t]he circumstances under which the jailhouse witness initially provided information supporting such testimony to [the police] or a prosecutorial official, including whether the jailhouse witness was responding to a leading question." P.A. 19-131, § 2.

This legislation is truly extraordinary, especially insofar as it requires the court to screen jailhouse informant testimony for threshold reliability and renders the testi-

mony inadmissible unless the state can affirmatively demonstrate the reliability of the testimony. Ordinarily, any probative testimony is admissible unless the court finds the witness to be incompetent by virtue of age, infirmity, mental incapacity or the like; the opportunity for confrontation and cross-examination is invariably considered to be a sufficient protection against false or misleading testimony. In creating the rarest of exceptions to this bedrock evidentiary principle for the testimony of jailhouse informants, the legislature has manifested its deep concern about the highly problematic manner in which such testimony is used by the state. The same considerations that prompted the legislature to act convince me that the defendant was entitled to the benefit of Natapoff's expert testimony on the subject of jailhouse informant testimony.

I note, finally, that the majority identifies a few cases to support its conclusion that the defendant was not entitled to the benefit of Natapoff's expert testimony on the dangers inherent in the state's use of jailhouse informants. The majority places particular reliance, however, on *United States* v. *Noze*, 255 F. Supp. 3d 352 (D. Conn. 2017), aff'd sub nom. *United States* v. *Dugue*, 763 Fed. Appx. 93 (2d Cir. 2019), in which the United States District Court rejected the request of the defendants in that case to adduce expert testimony concerning the government's use of "two so-called 'cooperating witnesses,' i.e., alleged [coconspirators] of the defendants who have pleaded guilty and who are 'cooperating' with the [g]overnment by testifying at trial in hopes of receiving a sentence reduction." Id., 353. I respectfully disagree that *Noze* represents persuasive precedent for the majority's holding in the present case, primarily because *Noze* simply did not involve the prosecution's use of testimony from a *jailhouse informant*; at issue, rather, was the admission of testimony from cooperating coconspirators of the defendants in that case. The difference between the government's use of cooperating coconspirator testimony in *Noze* and the state's use of jailhouse informant testimony in the present case is as critical as it is evident: as I previously discussed, the testimony of jailhouse informants is readily fabricated and otherwise particularly suspect for a number of reasons not generally apparent to jurors. The same cannot be said of other, more traditional cooperating witnesses who, like the government's witnesses in *Noze*, have not come forward as part of a prison culture that is largely hidden from public view and whose testimony is not so easily concocted.

For the foregoing reasons, I dissent from part III of the majority opinion in which the majority determines that the Appellate Court incorrectly concluded that the trial court had abused its discretion in precluding the defendant from adducing Natapoff's expert testimony on jailhouse informants. For the reasons set forth by Justice D'Auria, I also dissent from part II B of the

majority opinion, in which the majority concludes that the trial court's erroneous exclusion of the video recording of Allain's polygraph pretest interview was harmless. Because I agree with and join parts I and II A of the majority opinion concerning the corpus delicti rule and the propriety of the trial court's exclusion of the video recording of Allain's interview, respectively, I respectfully concur in part and dissent in part.

[1] We previously have stated that "the trial court should instruct the jury that the [jailhouse] informant's testimony must be reviewed with particular scrutiny and weighed . . . with greater care than the testimony of an ordinary witness. . . . In addition, the trial court may ask the jury to consider: the extent to which the informant's testimony is confirmed by other evidence; the specificity of the testimony; the extent to which the testimony contains details known only by the perpetrator; the extent to which the details of the testimony could be obtained from a source other than the defendant; the informant's criminal record; any benefits received in exchange for the testimony; whether the informant previously has provided reliable or unreliable information; and the circumstances under which the informant initially provided the information to the police or the prosecutor, including whether the informant was responding to leading questions." (Citations omitted; internal quotation marks omitted.) *State* v. *Arroyo*, supra, 292 Conn. 570–71. In the present case, the trial court complied with *Arroyo* by instructing the jury that "[a]n informant may have such an interest in the outcome of this case that his testimony may have been colored by that fact," that the jury "should consider the benefits that the state has promised the informant in exchange for his cooperation," and that it "must look with particular care at the [informant's] testimony . . . and scrutinize it very carefully before you accept it." It is noteworthy, however, that the trial court did not instruct the jury on any of the other considerations concerning the credibility of jailhouse informant testimony that we identified in *Arroyo*.

[2] In regard to this particular aspect of jailhouse informant testimony, in *Arroyo*, we quoted the findings and observations of several commentators, who explained, among other things, that jailhouse informants often believe that they have nothing to lose and everything to gain by testifying for the state because they are already incarcerated, incentives that may seem trivial to the average person may serve as an "invitation to [commit] perjury" to someone who is imprisoned, and such informants may be motivated by "emotional impetuses" such as "the thrill of playing detective, fear, and survival . . . ." (Internal quotation marks omitted.) *State* v. *Arroyo*, supra, 292 Conn. 569 n.10.

[3] *Marquez* was a habeas case involving the relationship between the state and the petitioner's accomplice, who had testified for the state at the petitioner's underlying criminal trial. See *Marquez* v. *Commissioner of Correction*, supra, 330 Conn. 577. Everything we explained in *Marquez*, however, about the nature of the relationship between the state and its cooperating witnesses generally applies equally, if not with greater force, to the relationship between the state and jailhouse informants. See id., 603–605.

[4] Indeed, those risks were manifest in *Marquez*. At trial, the cooperating accomplice, who was charged with felony murder and faced a mandatory minimum prison term of twenty-five years for that offense, testified that he expected no leniency or other consideration in exchange for his testimony, and that he was cooperating with the state solely because it was "the right thing to do." (Internal quotation marks omitted.) *Marquez* v. *Commissioner of Correction*, supra, 330 Conn. 581–82. Yet, "[n]otably, after [the accomplice] testified [for the state] the prosecution chose not to pursue the felony murder charge originally brought against him. Instead, he was sentenced to [an effective] term of [imprisonment of nine years] . . . for . . . robbery . . . and attempt to commit robbery . . . ." Id., 588.